15-2009 Aqua Shield v. Interpool Pool Cover Team May it please the Court, my name is Greg Coffey and I represent the Appellant Pool and Spawn Closures and Alcoff. Your Honors, this is the second time that this matter has reached this Court and so I believe that the issues here today are relatively narrow and I would like to address a couple of those. And first I'd like to address the issue that the trial court on remand determined that enhanced damages and attorney's fees were not warranted based upon the totality of the circumstances in this case. My adversary takes the position in this case, as do we, that a reversal of that determination would have to be an abuse of discretion standard consistent with... I'm sorry? I'm confused about something. You represent the defendants here, right? You prevailed on that issue. Shouldn't you be arguing your appeal? I absolutely am prepared to, was planning to fit into that. I mean, you're first, so it seems like you should be arguing your appeal. So I can be happy to start with that. And our position, Your Honor, is that the trial court erred in adopting gross revenue as the basis for the royalty in this case. As Your Honors know from the prior hearing, the argument before the court and the trial court, Judge Stewart in Utah, determined originally that net profit should be used. And on remand, the determination consistent with this court's instruction, on remand determined that $216,000 was an appropriate award based upon 8% of $2.7 million in gross revenue or gross sales, really the same thing. Our position is that the burden with respect to royalty fell upon the plaintiff or appellee in this case, and that what the trial court was faced with in this case was really a dartboard. They had no expert. They had no testimony or sales information from Aquashield. Isn't there some evidence, though, that there were some meetings between the parties in advance, the litigation and the base that was discussed for what the reasonable royalty would relate to? Trial Exhibit CC. And that's my point today, which is the discussion that took place, talked about a royalty in a meeting that took place between Jan Zitko of Alcoff and Robert Brooks of Aquashield of 2.5%. Yeah, but that was I don't see your briefs is questioning the percentage rate that was determined by the district court. I see it as questioning what the base is, and the base that is supported by those actual negotiations is the sales of the devices themselves. Am I right? You're right, except that we urge that gross profit instead of net profit is the appropriate base here, and here's why. Right, but the record here is thin. The other side has Trial Exhibit CC, which shows that the parties at one point was planning on using sales revenue as a base for a possible royalty. What evidence do you have on your side that would show that the hypothetical negotiators really would be using profit? As Judge Stoll just alluded to, the email that was made part of the evidence at trial before Judge Stewart, which talks about a discussion between the principles of the two companies where they talked about 2.5%. 2.5% of what? 2.5% of gross profit. Where's that in the record? That is in the appendix attended to the appeal that we've made here. That's correct. Great. And our position is that there are... Can you give a specific citation? I can get that for you, sure. Is it 506? I'm sorry? Is it A-506? Yes. The numbers that we're talking about are the gross profit being $600,000, the gross revenue being $2.7 million. To respond to your question, Judge Chen, we believe that by Judge Stewart keeping the royalty rate at 8% and not changing that, where he had no expert testimony, where he had no evidence presented by the plaintiff at trial. I have two questions. He had a dark board. I have two questions. First question is where in A-506 does it show that some contemplation of using profits as the base? It is not stated in there. Indeed, something, it seems to me, to the contrary, because this is talking about the license fee, and it says, I don't know, under? I don't know what you would think. Uder license fee will be out of selling prices in Europe. That sounds like sales, revenues, not like profit of any sort. And the reason we advance gross profit as an appropriate measure, and I recognize fully that most courts use gross sales. I recognize that, and I acknowledge it. But we think, based upon the fact that they were using and negotiating in real time, a lower royalty percentage. The fact that Judge Stewart kept 8% on remand and used 8% against Have you argued the percent? Are you arguing that in this case on appeal? I'm not arguing a change in the percent. I'm saying that the unchanged, I want to be clear about this, I'm arguing that the fact that Judge Stewart on the remand did not change the percentage at 8%, and the fact that at page 506 there's a reference to a much lower percentage, that he erred when he used a higher number of gross sales, and that based upon the fact that we were dealing with a dark board at trial, no expert, no testimony on it, that it's more appropriate to use gross revenue. Just to be clear, my understanding is Judge Stewart said that no party disputed the 8% rate number. And so now it was all about just trying to figure out what to designate as the base. And then one side had an exhibit to point to that showed there's some evidence, indicia that the negotiators would use sales price. And he said there was no evidence on the other side of the ledger that would suggest why the two parties would use profits. Why is it clearly erroneous for the judge to use the one piece of evidence that pointed in one direction? The percentage is not before this court on appeal. So that's absolutely correct that 8% was adopted and it wasn't challenged. What we're saying is that the 8%, along with the documentation that is in Exhibit 66, which is at page 506, supports an approach that would come up with gross sales, excuse me, gross profit as a basis, a middle ground. You got $2.7 million against 8%. The case was remanded based upon 8% of the gross profit, the net profit. We think that gross profit at $600,000 is the appropriate remedy, and we think that Judge Stewart had— But for purposes of the appeal, you have to go beyond saying what you think is appropriate. You have to be saying that the alternative that Judge Stewart adopted is actually legally incorrect under a clear error standard. In the world of damages, there's usually a range of what can be appropriate, and he decided this. The question is not whether yours would have been just as good, but whether his is sort of actually improper. I completely understand, and our position on that is, going back to my original comment, that Judge Stewart had a dartboard and that the burden falls upon the plaintiff, in this case, the appellee on that issue, and that if there's going to be a determination, that my client should not be penalized as a result of that. And that's why we believe that Judge Stewart erred in determining that gross sales would be the appropriate base to go against that. So just going back to another point you were making, I think you were saying that the percentage rate at page A506 is very different than 8%, and I guess some of the percentage rates are like 5.5%, which is less than 8%. But what about the fact that when you are in the exercise of a hypothetical negotiation, at that point you're presuming that patent is valid and infringed, and it's under that construct that you're determining the appropriate royalty rate to be applied to the appropriate base, in this case, since you're not challenging the rate. I mean, isn't that something that would be proper to be taken into account, the fact that this evidence at A506 is before anybody has presumed that the patent is valid and infringed? I think your question, if I understand it, is that the rate might be a little less where there is not any determination or any resolution to that issue, and so 8% isn't that far off? I guess that's it. I mean, one thought would be, you know, under the hypothetical construct, you're not just looking at what the parties actually negotiated, but you've got a backdrop there of understanding, hey, now it is uncontested. That patent is valid and infringed. In most cases, that would be the case, Your Honor. In this case, as I say, Judge Stewart had nothing to work from, and so we believe that his determination went through the Georgia-Pacific test with respect to the rate. That's not before the court, and that's not disputed. It came up with 8%. We think in indicia, that kept the rate the same. It impacts on the base, and to your point, the negotiation at 5%, you could argue, yeah, that once the patent is determined to be valid, it may be higher, it may be lower, because it's not. Our position is that what Judge Stewart did on the remand was arbitrary and capricious and in clear error on the basis that he should have used gross profit as a reasonable middle ground here. He had nothing else to work with. You used half of the time that you meant to save for rebuttal. Yes. Why don't you let a friend talk? I'll reserve that as my thank you. Mr. Zenger. I had reserved some time. Do I get rebuttal after I am or not? Since there's a cross-appeal here, you said you want to use 12 minutes and then three minutes for... I want to begin with the premise that Judge Stewart found. I don't exactly know why he made that finding. One of his findings was this was not a close case. Now, the reason he said it was not close, I still don't understand, and I think is legal error in his findings. But he determined this was not a close case. And why was it not a close case? This is a case in which it was not only exceptional but extraordinary and stands out from others. This is a case in which the defendants had approximately eight years to show some type of defense and they never did. And I just want to rehearse the history of this case just a little bit. In 2001, AquaShield entered the market. We have trial testimony which we cite in the brief that the defendants were following our actions. They were looking at our website. They were looking at our product materials, and they were looking at us at trade shows. So here AquaShield is in the market from 2001 to 2005 with its unique patented device. Enter defendants into the market, 2005. What do they come with? They don't come with some other device that doesn't infringe. They come with a nearly dead-on knockoff four years after we come into the market. Copying can be shown not by some smoking gun but by the circumstances. In this case, we have the admission of the parties. They were watching us. And so what do we have? We have them copying us coming into the market. Then what happens? Does watching equal copying? No, watching does not equal copying. But they had access to our product information about our device, and they knew that we were asserting a patent because we had it marked from the get-go. There's no issue that we didn't have it marked from the get-go. They knew or should have known. But worse, in 2005, we send a cease-and-desist letter. And what happens? We get totally snubbed, nothing. Instead, they choose to litigate. And from 2005 until the briefs in this case, they argue this denial of the preliminary injunction before the United States District Court in New York. This court, in its previous decision, in which Judge Chen and Judge Stronti both participated, determined that that was a legally insufficient basis to have any good faith belief of non-infringement or invalidity because it didn't go to those issues. It went to an issue of personal jurisdiction and a lack of some factual information, and that was it. So what do we have in 2005? We have a cease-and-desist. Now they are for sure on notice of our allegations, and they do nothing. They present no evidence of non-infringement and no evidence of invalidity to the United States District Court in the District of New York. That case languishes three years in Hague Convention service and in a motion to dismiss and transfer to Utah. It comes to Utah, and what happens? We file a motion for summary judgment on infringement. Here we are now in 2011. Sorry. Now is their chance to put on their non-infringement case. This was transferred to Utah in 2008 or 2009? 2009. 2009, and the motion for summary judgment was 2011? I think that's right. Why did it take? I don't have the date. It's in the cases. It's even in the court's previous decision. But the point is we bring a motion for summary judgment on non-infringement, and what do they put forth with non-infringement defense with respect to claims 1 through 14 and 16? A big fat zero. Absolutely nothing. The court grants summary judgment because they put on no defense. We bring another. They bring a motion for summary judgment on invalidity, and we cross them. What evidence do they put on of a single piece of prior art anticipating each and every element of a single claim? What do they present? Nothing. Zero. This is now in 2012, or 2011-2012. So now we have them in the market from 2005 to 2012 with no non-infringement or invalidity basis that they want to present to anyone, including the court. Can you walk through? Your argument here is all about, I guess, really one paragraph in Judge Stewart's opinion in which he walked through the read against Portek factors. And I think your argument, more or less by definition, is that he abused his discretion by making a series of clearly erroneous findings or otherwise mislead. So can you take these one at a time? I would be happy to do that. First one. Because he did find that they willfully infringe. He did find that they willfully infringe. But nevertheless said that's not the end of the inquiry. I'm now supposed to consider whether enhanced damage. And you don't argue for a different result between enhanced damages and fees. As far as I can tell in your brief, they stand and fall together. Yes. Okay. So the first thing he said is— Let's go to that. Let's go to that analysis. In particular, that they were making—presented testimony that they, the other side, was making similar products prior to issuance of the patent. Okay. Perfect. That's erroneous. Because when it came to their summary judgment motion on invalidity, they had an opportunity to put that evidence in. And not only didn't, didn't they? They couldn't. Because the very things they put in, the court rejected. They put in some vague screenshots. They put in some schematics that had nothing to do with it. And so when they had the opportunity to show that they had invalidating sales or prior sales that would exculpate them, they couldn't do it. And so why is this finding erroneous? This finding is erroneous because the judge previously found that they hadn't put forth any evidence of it. What is this statement based on? It's based upon an uncorroborated statement made by a layperson at the trial that we were making them. But there was no evidence of it. They didn't bring a single shred of evidence to show that they had made the product like it or ever sold it in Europe or in the United States. There is no evidence of it. Zero. There was no citation to the record. If they had made the product and sold it six months before you applied for the patent, that wouldn't have been invalidating it, would it have? I think at that point in time, 102B was a year. Right. It had to have been a year before. So they might have done that and still that wouldn't have been copying your patent but not be invalidating. Worse. There was no evidence. The record is so thin on this. It's a little hard to— On this point, it isn't because the judge found in a summary judgment ruling there is no evidence of an invalidating sale in the United States. Zero. None. So how can he conclude that they were making devices and therefore they thought they were okay? He couldn't. He's making conflicting findings of fact. There's testimony which you think is not terribly well-grounded but there is testimony, right? Yes, and when we asked them to corroborate it, they were unable to. And when they had the opportunity to corroborate it, they produced nothing. So on that point, we believe that was an erroneous finding. So and then the next thing Judge Stewart says is there's evidence they sought the advice of counsel. We don't know what—and I guess—and were informed that they could continue to sell their products. Well, everybody can be informed that they can continue to sell. The question is, is there a risk or is there a liability? But in this case, let's take it from—let's bite it off in pieces. I'm sorry. Did you seek in discovery this opinion since they were relying on it? We asked them if there was one, and they did not produce anything for us in discovery or at the trial court. So the court found in its earlier findings there was no written opinion. That was a finding of fact, number 20, in the court's first findings. No written opinion. So what are we left with? We're left with an oral. So let's take those— Did you have the identity of who gave this oral opinion? No. So—and we don't even know if it was counsel who was competent in these matters, but I can't really go there because I don't know who it was. So what do we have? If it's oral, there can only be a couple of things that happen. First, that oral opinion could have said, well, based upon the denial of the preliminary injunction in New York, you can go ahead. But this court has already determined that that was an insufficient legal basis. Okay? So we cross that one off. So that one's no good. So if the oral opinion was that they infringed, then they were reckless and they went forward knowing they infringed. If that oral opinion was they didn't infringe, they never told anybody what that basis was. They had opportunities in the summary judgment proceeding, and they never showed what it was. And what did the court say? That their basis was objectively unreasonable and that there's no way a litigant could rely upon their non-infringement case. So if the oral opinion was non-infringement, we still don't know what it was because they never presented it to us, and apparently they didn't follow it. Okay? So if their oral opinion was the case they patent was invalid, again, they never presented it to us or to the court. So that doesn't make sense. And if the oral opinion was that it was valid and they went forward, then they were dubiously reckless. But there's no evidence in the record as to what that oral opinion was. Can I just ask you one thing I'm not remembering if I ever knew. What opportunities, for example, on remand, did you all have the opportunity to present new evidence? No. Was that, I mean, did the judge say, we're not going to do that, I'm just going to rule, you're going to, did you have an oral argument in front of the judge? Was there new legal filings? There was. He allowed a paper filing. But said, did he forbid the submission of new evidence? He didn't offer any and he didn't accept any. And you didn't ask. When you say didn't accept any, did you ask and he said no? I don't recall either party asking to supplement with additional information. But the point here is if he says they relied on counsel, what was it and what effect did it have on the party? It appears to be undisclosed and you cannot hide behind some undisclosed defense for a basis of non-infringement or invalidity. It just smacks against every rule. Was it limited to willfulness beginning after he had ruled on summary judgment of validity and infringement? No, he said it began at least then, but he recognized that because it was a legally insufficient basis to rely upon the denial of the preliminary injunction in the New York case, that they had never presented at any time a non-infringement or invalidity decision. Right, but I guess I'm trying to figure out what the judge meant by that. I think one reading would be that in his view that the willfulness began as soon as he issued his summary judgment orders confirming the validity and confirming infringement. And so the window of infringement is actually during this later stage of the litigation. Is that a fair reading of his opinion? That's not how I read it, Judge Chin. I read it as saying it began at least then because he did the analysis that showed they never offered a non-infringement or invalidity opinion before then. They were on notice with a cease and desist letter. The court went through this. They were on notice and they did nothing to come forth with that defense even up to the time of the summary judgment. So I don't read it as being there was only willful infringement after his decision. And so I'd like to go on to a couple of these other points. Just so you know, you have about a minute left. Right. If you want to stand up a second time after Mr. Coffey stands up, you'd better save the time now. You don't have to, but it's up to you. Okay, of my total time. That's right. Thank you. I'll be very brief. Your Honors, Mr. Zenger is making a pre-octane argument. He agrees in his brief that the evaluation before this court should be abuse of discretion. But then he goes through in his brief at page 29 and he cites to Judge Stewart's decision. And he cherry picks each of the individual factual determinations that Judge Stewart looked at in denying enhanced damages. Right, but he's perfectly entitled to do that. It's an abuse of discretion, among other things, if you rely too much, I'm using the shorthand, on clearly erroneous findings. So he's entitled to walk through that paragraph with the seven or eight read-against-portent findings and say, this one's clearly a clear error, this one's a clear error, and I lost five to three on the finding, so I can show that four of the five were wrong, and so you've got to do it again. The question is, does he have the goods to back up the argument that a bunch of those adverse findings were clearly erroneous? I agree with you, and our position is he doesn't have the goods. And that reliance in octane and the cases decided consistent with that. Keep in mind, and I know your honors are familiar with that line of cases, where our Supreme Court determined that they eliminated clear and convincing evidence on appeal, and they imposed on the trial judge the determination of whether enhanced damages were appropriate, based upon a totality of the circumstances. So my position with respect to abuse of discretion, and I agree with you completely, your honor, that he can go through and analyze that, that's his prerogative. But the issue is that my suggestion to the court is that it's not a de novo review. That it's only based on that. We understand that. And also, octane relates to attorney fees, not enhanced damages under willfulness. Well, I would cite to high mark octane and halo as a basis for the trilogy of cases, which combined talk about enhanced damages and attorney fees. Let me ask you this. Sure. Why didn't the district court clearly err in giving credit to opinion of counsel in this particular situation, when there was no written opinion, and there was nothing in the record. So how could he say that this was somehow an authentic, legitimate opinion of counsel that protected you? Because there was testimony of Mr. Stonkas at trial and Mr. Zitko. And to give you another example. Was it a non-infringement opinion, or was it an invalidity opinion? I'm sorry? Was it a non-infringement opinion, or was it an invalidity opinion? I think it was both. How could it be a non-infringement opinion when your side didn't present any evidence or argument for non-infringement in the summary judgment proceeding? The attorney who represented Pool and Spa and Alcoff in New York, when the case was dismissed in New York, was the attorney who was a patent attorney who provided the opinion. It was not in writing, but it was provided to them at that time. We have concerns also with the elements that Judge Stewart went through, Your Honor. For instance, what needs to be, I think, brought out is that the case in the Eastern District of New York was dismissed on jurisdictional grounds in 2006. Aqua Shield didn't file their complaint in Utah until three years later, 2009. How can my client— Was the case transferred, or did they— It was transferred, but then they filed a complaint, and that's what activated the case and got it started. Our position is they sat on their rates for three years. The complaint, without dispute, was filed in Utah in 2009. The dismissal in the Eastern District of New York was in 2006. That case didn't even get started until that time, Your Honor. You have exceeded your time, and I thank you for your argument. I thank the court for its patience. Thank you. Mr. Zenger, I think you have about a minute. Yes, I would just add with respect to your question, Judge Chen, about this infringement opinion. We cited in our briefs a testimony of Mr. Stonkus, who was just now mentioned. And I asked him, what was the basis of that opinion? He couldn't tell me. And then I said, well, give me some idea. Was it non-infringement? Was it invalidity? He said, no, it was mostly court rulings. And there was only one court ruling, and that was the denial of the PI in New York. It is our view, Your Honors, that Judge Stewart abused his discretion because there is clearly evidence of copying when he says there was none. There was evidence of harm. There was evidence of concealment. And his factors, as we set forth in our briefs, are either clearly erroneous or an error in judgment. And with respect to the request for damages, the Fromsen case clearly says the judge can base damages on gross sales. They admitted in their brief that's the one the judge chose, and it's proper. Thank you. Thank you, Mr. Zenger. Thank you to all counsel, and the case is submitted.